Filed 4/9/25  P. v. Walker CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DEONTA WALKER,<br><br>    Defendant and Appellant. | D082931<br><br>(Super. Ct. No. FVI1200836) |


APPEAL from an order of the Superior Court of San Bernardino, Debra Harris, Judge.  Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

In 2012, Deonta Walker, Randy Rollins, Larry Fradiue, and another unidentified man robbed a jewelry store inside the Indoor Swap Meet in Victorville.  Inho Lee, who worked near the jewelry store, chased them out the door.  Fradiue shot him, and the perpetrators drove off.  Lee subsequently

died, and a jury convicted Walker of, among other things, robbery and murder.

Walker now appeals an order denying his petition for resentencing on the 2012 murder conviction under former Penal Code section 1170.95 (now section 1172.6).[1] After an evidentiary hearing, the trial court concluded Walker was a major participant in the underlying robbery who acted with reckless indifference to human life. Accordingly, the court found Walker guilty of Lee's murder under a still-valid theory of liability.

Walker argues on appeal that the record does not contain sufficient evidence to support the court's finding that the prosecution met its burden, under current law, of proving him guilty of murder beyond a reasonable doubt. Having considered the relevant factors set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), we disagree and affirm the order.

## FACTUAL BACKGROUND[2]

A. *2014 Trial Testimony*

The Indoor Swap Meet in Victorville has two main entrances on the front of the building. On March 26, 2012, Jeanetta H. was shopping at the jewelry counter located directly across from one of the entrances. She looked to her left when the building's doors opened and saw two or three men in black hoodies enter. They walked past her and, moments later, she heard

---

[1] Senate Bill No. 1437 (Senate Bill 1437) (2017-2018 Reg. Sess.) enacted section 1170.95, which was renumbered to section 1172.6 without substantive change in the text. (Stats. 2022, ch. 58, § 10 [effective June 30, 2022].) We will refer to this statutory provision as section 1172.6 for the purposes of this opinion.

[2] We granted Walker's motion to take judicial notice of the clerk's and reporter's transcripts from his trial.

glass breaking.  She looked to her right and saw one man strike the jewelry display case with a hammer before reaching into it.

Maribel L. was working about three booths from the jewelry store when she heard glass breaking.  She saw Lee near the jewelry store waving a jewelry box in front of him.  As she approached, she saw a Black man in a black hoodie lift his arm and point a gun straight ahead of him in the direction of the jewelry store.  She said the man with the gun was near the entrance and did not exchange any words with Lee.  Maribel turned around and ran and then heard three or four gunshots, followed a few seconds later by two more that sounded farther away.

Luz C. was working at a beauty shop directly across a walkway from the jewelry counter.  She observed a Black man in a black hoodie break the glass with a hammer and remove jewelry.  Luz's mother signaled to Christina, who worked at the jewelry store, and they hid together behind a display case while Luz called 911.

Samantha T. had just returned to her vehicle, which was parked directly in front of the Indoor Swap Meet.  She noticed a white SUV stopped behind her car near the right side of the swap meet.  As she was putting her son into the car, she glanced back and saw two Black males, one with a gun in his hand, standing by the white SUV.  At that point, the SUV had moved up and was stopped between the sets of doors.  The two men ran into the swap meet and then, about 30 seconds later, they ran out and jumped into the SUV through the rear passenger door.  She heard gunshots and, after they sped off, she saw a man lying on the ground.

Rodney K. also observed the white SUV parked in front of the swap meet.  He heard a pop and then saw a man in a hoodie run around and jump

3

into the back seat on the driver's side of the vehicle as it drove off. He walked over and discovered Lee lying on the ground.

Ernesto A., Lee's coworker, was standing outside by the entrance to the right when facing the Indoor Swap Meet. The SUV pulled up to that entrance, and he said one Black male wearing a black sweater with white on it went inside and then came back out holding a gun. Meanwhile, the vehicle had pulled forward toward the other entrance.

Ernesto ran inside through a back entrance and saw people running back and forth and heard loud banging noises. He later identified Walker from a photographic lineup as one of the people he saw in the jewelry store. The San Bernardino County Sheriff's Department retrieved video surveillance footage from multiple cameras, and Ernesto associated Walker's photograph with a still shot from surveillance footage showing Walker leaving the swap meet with jewelry in his hands.

A crime scene specialist also processed a broken hammer handle inscribed with "Genuine American Hickory" that was found at the scene and was able to lift a latent fingerprint matching Walker's.

Officers traced the SUV to a location in Compton, California, where it was recovered the same evening. Antonio H., the registered owner of the vehicle, testified that he had recently sold the vehicle to a young Black male but did not know his name. The inside of the Jeep had been burned, but investigators found an "ADT, Genuine American Hickory" hammer similar to the one left at the jewelry store and gloves that appeared like ones worn by some of the suspects in the surveillance footage.

Joseph Sumner, a gang investigator from the Los Angeles County Sheriff's Department who was familiar with Compton gangs, testified that the Santana Blocc Crips were a criminal street gang with a fluctuating

4

membership of over 200 individuals. He identified Walker in a photograph taken from the surveillance footage. Based on Sumner's contacts with Walker, Walker's self-admission, his association with other gang members, his presence in Santana Crip territory, and information other officers had given to Sumner, it was Sumner's opinion that Walker was a Santana Blocc Crip. For similar reasons Sumner testified that codefendants Rollins and Fradiue were also Santana Blocc Crips.

In 2014, a jury convicted Walker of first degree murder (§ 187, subd. (a); count 1), robbery (§ 211; count 2), and active gang participation (§ 186.22, subd. (a); count 3). The jury also made true findings on gang and firearm enhancements and robbery and gang-murder special circumstances. Walker was sentenced to 30 years eight months to life followed by a consecutive term of life without the possibility of parole. On appeal, we reversed the gang-murder special circumstance and stayed the sentence on the robbery and active gang participation counts under section 654, but otherwise affirmed the judgment. (*People v. Walker* (Apr. 10, 2017, D071097) [nonpub. opn.].)

B.  *2023 Evidentiary Hearing*

Walker filed a petition for resentencing under section 1172.6. After the court found the petition stated a prima facie case, it conducted an evidentiary hearing under section 1172.6, subdivision (d).

At the evidentiary hearing, the prosecutor provided an initial rendition of the facts, and then the court offered a tentative decision. It said the issues were whether Walker was a major participant and whether the acts merely created a dangerous situation in which death was possible. The court understood that it needed more than an act that created a dangerous

5

situation, explaining that "[t]he probability of death from the act must be more than remote or merely possible."

The court opined that "planning and participating in an act where a gun is pointed at a person's head is a situation that [*sic*] death or serious danger to human life is more than a mere possibility. It is likely." In finding the robbery "more than a smash-and-grab," the court explained, "[a] smash-and-grab does not entail planning for resistance and preparing with firearms." The court's tentative ruling was that there was more than sufficient evidence that Walker was a major participant. It thus sought argument as to whether Walker showed reckless indifference to human life.

The prosecutor said the surveillance footage showed Walker directing Fradiue over to his location and argued this either indicated that Walker had a leadership role or that he needed protection from Fradiue, who was armed. She explained that later footage showed Lee chasing the young men out of the swap meet armed only with a blanket folded up inside a plastic bag. The prosecutor contended Walker had plenty of time to grab Fradiue and pull him into the SUV or to push Lee down, so they had more time to escape. She also pointed out that Walker did not call 911 or try to assist Lee.

Defense counsel responded that Walker allegedly making a waving motion did not necessarily mean he was waving at Fradiue. In response to the court's earlier statements, counsel submitted that the videos did not show Fradiue aiming the gun at anyone's head but rather waving it around. She also emphasized that Walker was the first one out of the building, and there was no indication that he even saw the shooting.

The prosecutor conceded there was no evidence presented at trial that Walker knew of any prior use of lethal force by Fradiue. She then showed the court still photographs taken from the surveillance footage before playing the

6

surveillance recordings from five cameras.[3]  She explained that the individual shown entering the swap meet ahead of Walker was identified during the trial as Rollins.  Walker was wearing what looked like gray sweatpants.

At the conclusion of the hearing, the court found that the People had met their burden beyond a reasonable doubt of showing that Walker was a major participant and that he acted with reckless indifference to human life.  The court highlighted that Walker was present at the scene, that he came prepared to participate in the crime, and that he was standing near Fradiue when he had his gun pointed.  In the court's view, "[t]hat was ample opportunity if he was surprised that a gun was being used . . . to say, 'Hey.  That's not part of our plan.  Put the gun away.' "  Further, the court said Walker "saw the firearm being used in a way that was different from when you carry a firearm in case you have to protect yourself to get away" such as "in his belt or a pocket."  The court viewed pointing the weapon as "different from just showing a willingness to defend"—it showed a willingness to use the gun.  It stated that "[t]here was no effort to interfere or minimize whether or not there was opportunity to restrain the crime."

---

[3]     The video footage from these four cameras that was played for the trial court at the evidentiary hearing was not initially transmitted to this court by the parties.  Walker provided only the still photographs.  The time stamps on the photographs appear to be from different clocks set at different times and, thus, we can only calculate the duration of events recorded from the same camera angle.  Indeed, the detective who downloaded the surveillance footage from the Indoor Swap Meet testified that the time stamps for the footage from both digital video recorders were incorrect.

Because the video footage appeared critical to this court's determination, we independently requested it from the trial court.  The court's minute order for the evidentiary hearing indicated that "Trial exhibit 147 [was] played for the Court."  Accordingly, we requested and have received and reviewed Exhibit No. 147.

7

The court recognized that Walker's knowledge that a gun would be used during the robbery was not enough to show reckless indifference, but it also noted that Walker was physically present at the scene of the crime. From the court's perspective, Walker's opportunity to restrain the crime was when he first saw Fradiue with the gun. Walker could have walked out or said "[t]his is more than what I bargained for," and the court concluded that "it was more than a mere possibility that someone would come and try to defend their property." Considering the totality of the evidence, the court denied Walker's petition.

## DISCUSSION

Walker contends the record does not contain sufficient evidence to sustain the court's finding that he was a major participant in the robbery who acted with reckless indifference to human life. We disagree.

A. *Senate Bill 1437*

Senate Bill 1437 was enacted " 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.) It implemented this goal by amending Penal Code section 188, which defines malice, and Penal Code section 189, which defines the degrees of murder. (Stats. 2018, ch. 1015, §§ 2 & 3.)

Under the new legislation, a petitioner who files a petition and makes a prima facie showing he or she could not presently be convicted of murder under the amendments to the murder laws is entitled to an evidentiary hearing. (§ 1172.6, subds. (c), (d)(1).) At the hearing, the prosecution bears the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty

8

of murder" under the amended laws.  (§ 1172.6, subd. (d)(3).)  "[T]he superior court acts as an independent fact finder and determines whether the People have met their burden in proving the defendant guilty of murder."  (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1016 (*Henley*).)  "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated."  (§ 1172.6, subd. (d)(3).)

B.     *Major Participant and Reckless Indifference Standards*

To demonstrate that a nonkiller was a major participant in the underlying felony who acted with reckless indifference to human life, the prosecution must show that the defendant " ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' "  (*Banks*, 61 Cal.4th at p. 801.)  "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Ibid.*)  But, "participation in an armed robbery, without more, does not involve 'engaging in criminal activities known to carry a grave risk of death.' "  (*Id.* at p. 805.)

In *Banks*, our high court compiled the following list of factors to be considered in determining whether a participant's role should be considered "major":  (1) the defendant's role in planning the crime that led to one or more deaths; (2) the defendant's role in supplying or using lethal weapons; (3) the defendant's awareness of "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants"; (4) whether the defendant was present at the scene of the killing and in a position to facilitate or prevent the murder; and (5) the defendant's actions

9

after lethal force was used.  (*Banks, supra*, 61 Cal.4th at p. 803.)  No one factor is necessary or alone sufficient.  (*Ibid.*)

Because there was no evidence the defendant in *Banks*—the getaway driver in an armed robbery that resulted in a shooting death—saw or heard the shooting or could have prevented it, the court determined he was not a major participant.  (*Banks, supra*, 61 Cal.4th at p. 805.)  Likewise, because the direct perpetrator's killing of a security guard "was apparently a spontaneous response to armed resistance from the victim," there was no evidence the defendant knew his own actions would involve a grave risk of death.  (*Id.* at p. 807.)  Accordingly, the court concluded the defendant was not recklessly indifferent to human life.  (*Ibid.*)

The next year, our high court returned to this issue, endorsed the *Banks* factors, and sought to further define "reckless indifference to human life."  (*Clark, supra*, 63 Cal.4th at p. 611.)  To aid in courts' analyses of whether a defendant exhibited reckless indifference, the court offered the following factors:  (1) the defendant's "knowledge of weapons, and use and number of weapons"; (2) the defendant's "physical presence at the crime and opportunities to restrain the crime and/or aid the victim"; (3) the "duration of the felony"; (4) the "defendant's knowledge of cohort's likelihood of killing"; and (5) the "defendant's efforts to minimize the risks of the violence during the felony."  (*Id.* at pp. 618–621, capitalization omitted.)  The court explained that the requirements of being a major participant and having reckless indifference to human life " 'significantly overlap . . . , for the greater the defendant's participation in the felony murder, the more likely [the defendant] acted with reckless indifference to human life.' "  (*Id.* at pp. 614–615.)

10

C.    *Standard of Review*

We review the trial court's factual findings at a section 1172.6 evidentiary hearing for substantial evidence.  (*Henley, supra*, 85 Cal.App.5th at p. 1017.)  Through this lens, we view the record in the light most favorable to the judgment to decide if the prosecution introduced sufficient evidence—reasonable, credible evidence of solid value—to support a finding of guilt beyond a reasonable doubt.  (*Ibid.*)  We will affirm unless sufficient substantial evidence would not support the verdict under any hypothesis.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  We must accept any logical inferences the trier of fact might have drawn from the circumstantial evidence.  (*Ibid.*)

D.    *Analysis*

As the trial court recognized, the evidence here presents a closer case than many.  In *Banks*, the People proposed treating as a major participant anyone " 'whose conduct involves the intentional assumption of some responsibility for the completion of the crime.' " (*Banks, supra*, 61 Cal.4th at p. 803.)  Walker effectively admits he would be included in this class of participants.  But our high court concluded this test could not be reconciled with *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 because it would sweep in virtually every felony murderer and "violate the Supreme Court's requirement that each felony murderer's culpability be considered individually." (*Banks,* at p. 803.)  Thus, we must consider whether substantial evidence supports the court's finding that Walker's individual actions elevated his culpability to that of a "major participant."

Likewise, our high court has repeatedly made clear that " '[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony]

11

is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) In other words, given that "participation in an armed robbery, without more," does not demonstrate the required mens rea (*Banks, supra*, 61 Cal.4th at p. 805), our task is to evaluate whether there is credible, solid evidence of the "more" necessary to conclude Walker acted with reckless indifference to human life.

Based on our consideration of the *Banks* and *Clark* factors below, we conclude sufficient evidence supports the trial court's findings that Walker's personal role in the crimes leading to Lee's death demonstrated he was a major participant in the robbery who acted with reckless indifference to life. (See *Banks, supra*, 61 Cal.4th at p. 801.)

1.     *Major Participant*

Substantial evidence supports the court's conclusion that Walker was a major participant in the underlying felony.

As to the first *Banks* factor, Walker asserts there is no evidence he was the mastermind or planner behind the robbery scheme. But, even if he was not the mastermind, Walker joined with at least two other members of his gang[4] to drive all the way from Compton to Victorville to engage in this scheme. The surveillance footage showed the SUV pulling up to the first door, Fradiue and the other armed perpetrator walking in and doing a lap past the jewelry counter before running out the same door they entered. Meanwhile, the SUV pulled forward to the second door, at which point Walker and Rollins, wearing gloves and armed with hammers and a bag, exited the vehicle and entered the swap meet directly in front of the jewelry

---

[4]     Because the armed perpetrator in the white and black sweatshirt and the driver were not identified, we cannot confirm they too were Santana Blocc Crips, although that would be a reasonable inference.

12

counter. Fradiue followed behind them and provided armed coverage. Walker and Rollins accomplished their task of taking jewelry and then returned to the waiting SUV. In other words, even if Walker did not personally come up with the plan for the robbery, it is reasonable to infer he knew of, agreed to, and followed the well-orchestrated plan. Given the obvious pre-planning involved and Walker's significant level of involvement, this factor weighs in favor of finding he was a major participant.

The second factor—having a role in supplying or using lethal weapons—also somewhat supports the finding of major participation. It is undisputed that Walker himself did not use a gun, and the prosecutor conceded at the hearing that there was no evidence Walker supplied Fradiue with a weapon. But as the prosecutor argued below, the surveillance video shows Fradiue walking into the swap meet behind Walker and Rollins with his gun already drawn, and it also shows Walker gesturing to Fradiue to come closer to him and Rollins while they were taking the jewelry. A reasonable inference from the video is that Walker was directing Fradiue to provide him and Rollins cover with the gun and prevent others from interfering with the robbery. Thus, Walker had some role in Fradiue's use of the firearm during the robbery, even though he did not use or supply a firearm himself.

The third factor also weighs in favor of the court's finding. The evidence reinforces the inference that Walker was aware of the "particular dangers posed by the nature of the crime" (*Banks, supra*, 61 Cal. 4th at p. 803) because they were headed to a large swap meet at a time when it would be filled with vendors and customers. Unlike in *Clark*, where the store was closed for the evening (*Clark, supra,* 63 Cal.4th at p. 536), the robbery here occurred during business hours. Likewise, given the evidence of

13

planning and the fact that Walker and Rollins only had hammers and a bag, one could also reasonably deduce that Walker knew Fradiue and the other man were armed. Indeed, Walker expressed no surprise when Fradiue followed him through the doors with his gun already drawn, and Walker even beckoned Fradiue over to provide protection with the gun.

The record does not disclose, however, any evidence that Walker knew whether Fradiue had a history of using violence, much less killing. Although Sumner testified that Walker and Fradiue were members of the same large gang, he did not indicate they had a history of committing crimes together. Further, during the hearing, the prosecutor conceded that no evidence had been presented at trial that Walker knew of Fradiue's use of lethal force in the past.

The fourth factor focuses on whether the defendant was present at the scene of the killing and had the ability to facilitate or prevent the murder. (*Banks, supra*, 61 Cal.4th at p. 803.) Walker was present at the scene and carried out his role of smashing the jewelry case and taking the jewelry. The pivotal question on these facts is whether Walker could have prevented the murder. Walker argues the evidence does not establish he was near enough to Fradiue when the shots were fired to have prevented the shooting. We disagree he was not close to Fradiue. A surveillance video shows Walker entering the SUV through the rear passenger side door. Fradiue follows and gets in through the same door. Rollins then comes out of the building and heads around to the other side of the vehicle. Therefore, when Fradiue shot Lee seconds later, Walker likely was still sitting directly to his left.

That said, we cannot infer Walker realistically had an opportunity to restrain Fradiue or to protect Lee once they had already left the building. The prosecutor argued that at the time Fradiue turned around and pointed

14

the gun at Lee, there was "plenty of opportunity" for Walker to grab Fradiue or push Lee down. The court did not appear to adopt this argument, and the record belies the reasonableness of these assertions. The photograph of Fradiue backing out the swap meet door with his gun still drawn is time stamped 15:36:30. A photograph showing Lee bent over, likely the instant after being shot, is time stamped 15:36:35. This indicates Walker had less than five seconds to realize Fradiue was about to fire and then to intervene. He certainly could not reach Lee in that time. We also are not prepared to conclude he could have anticipated, in sufficient time to do anything about it, that Fradiue would fire as he was climbing into the vehicle.

Nonetheless, the evidence supports a finding that Walker had an earlier opportunity to cut short the progression of events that led to the killing. As noted, the prosecutor argued at the hearing that Walker appeared to wave Fradiue over, and she argued Walker wanted armed protection near where they were attempting to grab jewelry. Defense counsel disputed this interpretation, asserting that it was not clear what Walker intended with the gesture.

We agree the prosecutor's interpretation is at least a reasonable inference from the evidence. Based on our review of the video taken inside the swap meet during the robbery, Lee's legs can be seen shuffling back and forth in the aisle a few feet behind where Walker had just smashed the glass case. While other witnesses fled, Lee remained near Rollins and Walker, and Walker looked in his direction. A second later, Walker waved over Fradiue. Lee then bent down to pick up something on the ground behind Rollins, and his entire body can be seen on camera. After briefly pointing his gun at a man Walker had just yelled at who approached them from a side aisle near the door, Fradiue turned and pointed his gun directly at Lee. Walker looked

15

toward the firearm at this point and then returned to the jewelry counter to collect jewelry. Fradiue directed his weapon down the other two hallways and then back at Lee again. As he left the building, Walker again looked at Fradiue as Fradiue pointed the gun in Lee's direction. After Walker, Fradiue, and Rollins ran out, Lee could be seen running past the jewelry counter toward the door the robbers had exited.

Given this sequence of events, it is reasonable to infer Walker wanted Fradiue to bring the gun nearer to him specifically because Lee was hovering so close by. In other words, instead of leaving the scene or doing anything to protect Lee, Walker purposefully directed Fradiue's attention to Lee. And only after Fradiue had pointed the gun at Lee did Walker return to stealing jewelry. Thus, he did nothing to prevent the subsequent murder when he had the chance. (See e.g., *People v. Montanez* (2023) 91 Cal.App.5th 245, 279 [finding sufficient evidence of the fourth *Banks* factor where, among other things, the defendant was at the crime scene for the entire sequence of events leading up to the shooting and "had the ability and opportunity to help reduce the foreseeable risk [his accomplice] would use lethal force against the victims" but "did nothing"].) Walker's conduct in encouraging Fradiue to provide armed cover and point his gun at Lee and others inside the swap meet is evidence of reckless indifference.

Finally, the fifth factor looks at the defendant's actions after lethal force was used. (*Banks, supra*, 61 Cal.4th at p. 803.) It is undisputed that Walker did not stay to aid Lee or call 911, but he argues there is no evidence he knew Lee had been shot. In view of witness testimony that the car sped off after the gunshots, we do not find sufficient evidence that Walker realistically could have aided Lee. Ultimately, because Walker undoubtedly was motivated to flee the scene to avoid arrest for the robbery, and because

16

the evidence does not disclose whether he saw the victim lying on the ground, it is difficult to infer his frame of mind. (See *Scoggins, supra*, 9 Cal.5th at p. 679 ["when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state"]; *Clark, supra*, 63 Cal.4th at p. 620 [finding the ambiguous circumstances surrounding the defendant's hasty departure made it difficult to infer his frame of mind concerning the victim's death].) Therefore, we count this factor as neutral.

Nonetheless, after considering the totality of the evidence under the *Banks* factors, we conclude the court's determination that Walker was a major participant is supported by substantial evidence in the record.

2. *Reckless Indifference*

In assessing Walker's claim that insufficient evidence supports the court's finding that he acted with reckless indifference, we again apply the deferential substantial evidence standard. (*In re Harper* (2022) 76 Cal.App.5th 450, 460.)

First, we look at Walker's knowledge that weapons would be used and of the number of weapons used. (*Clark, supra*, 63 Cal.4th at p. 618.) As previously discussed, given the evidence of planning and the fact that Walker and Rollins only had hammers and a bag, it is reasonable to infer Walker knew Fradiue and the other man were armed. Although mere awareness that one's confederates are armed and that armed robberies carry a risk of death is alone insufficient to show the requisite mental state (*Banks, supra*, 61 Cal.4th at p. 809), coupled with other evidence, Walker's awareness that two armed accomplices were participating in the robbery during business hours weighs in favor of a reckless indifference finding.

17

Second, we consider that Walker was physically present throughout the robbery and evaluate whether he had opportunities to restrain the crime or aid the victim. (*Clark, supra*, 63 Cal.4th at p. 619.) Walker contends there was no evidence he even saw the shooting. In this respect, he likens the situation to that in *Scoggins* where the court found that, from his position across the street, the defendant probably could not see that his cohort was deviating from the plan to beat the victim by instead shooting him. (*Scoggins, supra*, 9 Cal.5th at pp. 671–672, 678–679.)

We are unpersuaded by this analogy because, unlike Scoggins, Walker was physically present at the scene and near Fradiue during the entire sequence of events leading up to the shooting, and he participated actively in the robbery by smashing the jewelry case and taking the jewelry. As our high court has explained, "[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Clark, supra*, 63 Cal.4th at p. 619.) Where the defendant can observe his cohorts' actions, " 'it is fair to conclude that he shared in their actions and mental state.' " (*Ibid.*) Additionally, where the defendant has the opportunity to " 'act as a restraining influence' " but fails to do so, " 'the defendant is arguably more at fault for the resulting murders.' " (*Ibid.*)

As we explained previously, it is reasonable to infer that Walker directed Fradiue's attention to Lee and beckoned Fradiue to come closer to provide armed protection. Walker also saw Fradiue point the gun at Lee twice but did nothing to restrain him. Instead, he resumed collecting jewelry and then carried it to the getaway vehicle. Stated differently, Walker was

18

"aware of and willingly involved in the violent manner in which the particular offense [was] committed." (*Banks, supra*, 61 Cal.4th at p. 801.) And, given that Fradiue only shot Lee after Lee followed them outside, despite Fradiue twice pointing the gun at him inside the swap meet, the murder could be viewed as a foreseeable result of several intermediate steps. Under these circumstances, it is fair to conclude Walker shared Fradiue's reckless indifference to human life.

The third *Clark* factor is the duration of the felony. (*Clark, supra*, 63 Cal.4th at p. 620.) *Clark* explained that "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Ibid.*) Thus, in determining whether a defendant exhibited reckless indifference to human life, "[c]ourts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant." (*Ibid.*)

Although the robbery lasted for several minutes during which time Fradiue held Lee and others away at gunpoint, the perpetrators' quick and orchestrated actions provided only a narrow window of opportunity for violence. The People even agree this factor could weigh against a finding of the requisite mental state because the duration was relatively short. Thus, we conclude this factor does not weigh in favor of finding reckless indifference to human life.

With the fourth factor, we consider the defendant's knowledge of his cohort's likelihood of killing. (*Clark, supra*, 63 Cal.4th at p. 621.) As noted above, there is no evidence Walker knew whether Fradiue had any violent proclivities or a record of using lethal force. This is not akin to cases like *Tison*, where the brothers knew their father had murdered a prison guard

19

(*Tison, supra*, 481 U.S. at pp. 151–152), or *In re Loza* (2017) 10 Cal.App.5th 38, 42–43 in which the defendant supplied a gun to the shooter just before a robbery right after the shooter admitted having just shot someone in the head.

On the other hand, in *Clark*, part of the court's analysis of this factor was that "[b]ecause defendant was across the parking lot while [the shooter] carried out the first phase of the robbery, defendant had no opportunity to observe anything in [the shooter's] actions just before the shooting that would have indicated that [the shooter] was likely to engage in lethal violence." (*Clark, supra*, 63 Cal.4th at p. 621.) The same cannot be said here. Walker had the opportunity to observe Fradiue repeatedly pointing the gun at Lee, as well as at the individual Walker yelled at when he approached. Because this should have given him some indication of Fradiue's inclinations, this factor weighs at least somewhat in the direction of a reckless indifference finding.

Finally, *Clark* instructs that if the defendant raises an argument that the defendant tried to minimize the risk of violence, courts should consider it as part of their reckless indifference analysis. (*Clark, supra*, 63 Cal.4th at p. 622.) The *Clark* court cautioned, however, that such evidence "does not, in itself, necessarily foreclose a finding that defendant acted with reckless indifference to human life." (*Ibid.*) Here, Walker's only argument in this regard is that the evidence does not show that he planned the robbery or played any role in Fradiue's decision to bring a gun. According to Walker, he did not take any hostages, make any threats, or restrain anyone, and in his view, the expeditious way he performed his role gathering jewelry tended to minimize the risk. We are not persuaded that these considerations override his actions in directing Fradiue's attention to Lee, thereby encouraging Fradiue to point his weapon directly at Lee, then doing nothing to minimize

20

the risk when he observed Fradiue pointing the gun at Lee. Recklessness contains both subjective and objective elements. (*Id.* at p. 617.) We conclude Walker's disregard for the risk to Lee was objectively unreasonable and " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*)

Ultimately, viewing the record in the light most favorable to the trial court's denial of the resentencing petition, and "after considering those aspects of the present felony that provide insight into both the magnitude of the objective risk of lethal violence and [the] defendant's subjective awareness of that risk" (*Clark, supra*, 63 Cal.4th at p. 623), we find sufficient evidence to support the conclusion that Walker knowingly engaged in criminal activities that carried a grave risk of death.

We therefore conclude that substantial evidence supports the trial court's factual findings that Walker was a major participant in the robbery and acted with reckless indifference to human life.

DISPOSITION

The order denying Walker's section 1172.6 petition is affirmed.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.

21